**Electronically Filed
Supreme Court
SCWC-17-0000145
17-JUN-2020
09:17 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

GILBERT V. MALABE and DAISY D. MALABE,
Respondents/Plaintiffs-Appellants,

vs.

ASSOCIATION OF APARTMENT OWNERS OF EXECUTIVE CENTRE,
by and through its Board of Directors,
Petitioner/Defendant-Appellee.

_____

SCWC-17-0000145

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000145; 1CC161002256)

JUNE 17, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH RECKTENWALD, C.J.,
CONCURRING AND DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY McKENNA, J.

### I.  Introduction

This certiorari proceeding arises out of a civil lawsuit brought by condominium owners whose unit was nonjudicially foreclosed by their association of apartment owners.  The unit was then sold by their association for substantially less than

fair market value, leaving the owners not only without their home, but also with mortgage liability.

On December 13, 2016, Gilbert V. Malabe and Daisy D. Malabe ("Malabes") then filed a complaint in the Circuit Court of the First Circuit ("circuit court") against the Association of Apartment Owners of Executive Centre, by and through its Board of Directors ("AOAO"). The complaint asserted claims for wrongful foreclosure and unfair or deceptive acts or practices ("UDAP") based on the AOAO's nonjudicial foreclosure and December 17, 2010 public sale of the Malabes' condominium apartment due to unpaid assessment fees. On February 17, 2017, the circuit court[1] granted the AOAO's Hawaiʻi Rules of Civil Procedure ("HRCP") Rule 12(b)(6) (1996) motion to dismiss the complaint for "failure to state a claim upon which relief can be granted," and entered final judgment.

The Malabes appealed to the Intermediate Court of Appeals ("ICA"). The ICA concluded that based on its decision in Sakal v. Ass'n of Apartment Owners of Hawaiian Monarch, 143 Hawaiʻi 219, 426 P.3d 443 (App. 2018), cert. denied, 2018 WL 6818901 (Dec. 28, 2018), cert. granted, 2019 WL 245225 (Jan. 17, 2019),[2]

---

[1]    The Honorable Rhonda A. Nishimura presided.

[2]    In summary, the ICA held in Sakal that because no statutory power of sale existed, "in order for [an] association to avail itself of the nonjudicial power of sale foreclosure procedures set forth in Hawaiʻi Revised Statutes [] chapter 667," "a power of sale in favor of a foreclosing
(continued. . .)

because the AOAO lacked a power of sale, the circuit court erred in dismissing Count I, the Malabes' wrongful foreclosure claim. See Malabe v. Ass'n of Apartment Owners of Executive Ctr., CAAP-17-0000145, 2018 WL 6258564, at 7 (App. Nov. 29, 2018) (SDO). The ICA affirmed the circuit court, however, with respect to its dismissal of Count II, holding the Malabes' UDAP claim time-barred and equitable tolling for fraudulent concealment inapplicable. See Malabe, SDO at 9-10.

On certiorari, the AOAO asserts the ICA erred in vacating the circuit court's dismissal of Count I, the wrongful foreclosure claim. The Malabes assert the ICA erred in affirming the circuit court's dismissal of Count II, the UDAP claim.

We hold the ICA did not err in reinstating Count I, the Malabes' wrongful foreclosure claim, based on its ruling in Sakal, which correctly held that in order for an association to utilize the nonjudicial power of sale foreclosure procedures set forth in Hawai'i Revised Statutes ("HRS") Chapter 667, a power of sale in its favor must have existed in association bylaws or in another enforceable agreement with unit owners. 143 Hawai'i at 220-21, 426 P.3d 444-45.

---

(. . .continued)
association must otherwise exist in the association's bylaws or another
enforceable agreement with its unit owners." 143 Hawai'i at 220-21, 426 P.3d
at 444-45.

We further hold Act 282 of 2019 ("Act 282")[3] does not affect this holding, as the statutory changes therein do not affect the Malabes' claims, which are based on HRS § 667-5 repealed in 2012.  We therefore do not address the Malabes' constitutional challenges to Act 282, as "[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."  Rees v. Carlise, 113 Hawai'i 446, 456, 153 P.3d 1131, 1141 (2007).  We note, however, that on April 10, 2020, the United States District Court for the District of Hawai'i held Act 282 unconstitutional as violative of the Contracts Clause of Article I, § 10 of the United States Constitution.[4]

We further hold the ICA erred in affirming the circuit court's dismissal of Count II by deeming the Malabes' UDAP claim time-barred.  Based on "notice pleading" standards and the principle that in ruling on HRCP 12(b)(6) motions to dismiss, allegations within a complaint must be accepted as true, Bank of America, N.A. v. Reyes-Toledo, 143 Hawai'i 249, 257, 428 P.3d

---

[3]  On July 10, 2019, Senate Bill 551, "A Bill for an Act Relating to Condominiums," was enacted as Act 282 without the Governor's signature.  See 2019 Haw. Sess. Laws Act 282, §§ 1-9, at 779-83; 2019 House Journal, at 734-35 (Gov. Msg. No. 1402); S.B. 551, S.D. 1, H.D. 2, C.D. 1 (2019), available at https://www.capitol.hawaii.gov/session2019/bills/GM1402_.PDF.

[4]  As explained by Judge Leslie Kobayashi in Galima v. Ass'n of Apartment Owners of Palm Court, CIV. NO. 16-00023 LEK-RT, 2020 WL 1822599, at *13 (D. Haw. Apr. 10, 2020), "[t]he Contracts Clause restricts the power of States to disrupt contractual arrangements.  It provides that '[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts.'"  (Second alteration and ellipses in original).

761, 769 (2018), the Malabes' UDAP claim should not have been dismissed.

We therefore remand this matter to the circuit court for further proceedings consistent with this opinion.

## II.  Background

### A.  Factual and procedural background

#### 1.  Complaint

As this case was dismissed via a HRCP Rule 12(b)(6) (2000)[5] motion to dismiss, the following allegations within the Malabes' December 13, 2016 complaint must be accepted as true.  Reyes-Toledo, 143 Hawai'i at 257, 428 P.3d at 769.  The following are relevant allegations of the Malabes' complaint.

In or around May 2005, the Malabes purchased Apartment 1907 in the Executive Centre condominium project located at 1088 Bishop Street, Honolulu, Hawai'i ("Apartment").  The purchase price was $225,000, paid in part with a $180,000 loan secured by

---

[5]  HRCP Rule 12(b)(6) states:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted[.] . . . If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

a mortgage on the Apartment.  The AOAO is the homeowner association for Executive Centre.  The AOAO did not hold a mortgage containing a power of sale on or secured by the Apartment.

On or about December 17, 2010, without providing the Malabes actual or adequate notice of default and an opportunity to cure the default, acting on advice it received, the AOAO published notice that it would sell the Apartment at a public sale pursuant to HRS § 667-5 (repealed 2012)[6] and HRS Chapters 514A and 514B.[7]  The AOAO pursued a nonjudicial foreclosure

---

[6]     As of the date of the Malabes' nonjudicial foreclosure, HRS § 667-5 provided in relevant part as follows:

> **§667-5  Foreclosure under power of sale; notice; affidavit after sale.**  (a)  When a power of sale is contained in a mortgage, and where the mortgagee, the mortgagee's successor in interest, or any person authorized by the power to act in the premises, desires to foreclose under power of sale upon breach of a condition of the mortgage, the mortgagee, successor, or person shall be represented by an attorney who is licensed to practice law in the State and is physically located in the State.  The attorney shall:
>
>     (1)  Give notice of the mortgagee's, successor's, or person's intention to foreclose the mortgage . . . ; and
>     (2)  Give any notices and do all acts as are authorized or required by the power contained in the mortgage.

(Emphasis added.)

As explained in Santiago v. Tanaka, 137 Hawai'i 137, 366 P.3d 612 (2016), "[p]rior to its repeal in 2012, HRS § 667-5 authorized the non-judicial foreclosure of mortgaged property only '[w]hen a power of sale is contained in a mortgage.'"  137 Hawai'i at 154, 366 P.3d at 629 (second alteration in original).

(continued. . .)

through HRS § 667-5 to circumvent the consumer protection provisions contained in HRS §§ 667-21 through 667-42 (Supp. 2008).[8]  The AOAO had fraudulently concealed the wrongfulness of the foreclosure proceedings by implying, stating, and misrepresenting that it held a mortgage with a power of sale when it did not, or that it was authorized to use HRS § 667-5 when it could not.  The Malabes relied on the false statements and representations of the AOAO concerning the AOAO's right to conduct a public sale pursuant to HRS § 667-5.  The Malabes were entitled to so rely because they were members of the AOAO, because of the AOAO's trustee-like relationship with the

_____

(. . .continued)

> This court examined HRS § 667-5 in Lee v. HSBC Bank USA, 121 Hawai'i 287, 218 P.3d 775 (2009), and found that it authorized nonjudicial foreclosure under a power of sale contained in a mortgage.  In Lee, the plaintiffs argued, and this court agreed, that no state statute creates a right in mortgagees to proceed by non-judicial foreclosure; the right is created by contract.

137 Hawai'i at 154-55, 366 P.3d at 629-30 (internal citations, emphases, brackets, and quotation marks omitted).

[7]     HRS Chapter 514A, which was repealed effective January 1, 2019, was titled, "Condominium Property Regimes."  HRS Chapter 514B is the Condominium Property Act.  See infra note 17.

[8]     These sections constitute Part II of HRS Chapter 667, an "Alternate Power of Sale Foreclosure Process."  Part II of HRS Chapter 667 provides protections exceeding that available in Part I of HRS Chapter 667, which contained HRS § 667-5 until 2012, by, for example, outlining specific notice requirements, including "[t]he date by which the default must be cured, which deadline date shall be at least sixty days after the date of the notice of default[.]"  HRS § 667-22(a)(6) (Supp. 2010).  Part II of HRS Chapter 667 was at issue in Sakal.  143 Hawai'i at 221, 426 P.3d at 445.  Therefore, pursuant to Sakal, the AOAO would also not have been authorized to proceed under Part II of HRS Chapter 667.

Malabes, and because the AOAO was acting as an agent or attorney on behalf of the Malabes pursuant to HRS § 667-10 (1993).[9]

At the sale, the AOAO successfully bid on the Apartment in an amount that did not constitute adequate consideration, and on January 4, 2011, the AOAO executed a quitclaim deed for the Apartment as both the grantor and grantee.  The quitclaim deed was recorded on January 7, 2011.  As a result of the public sale, the Malabes lost the Apartment, but remain liable for the amount secured by the mortgage.  The Malabes did not discover their claims against the AOAO until sometime in or around July 2016.  On January 11, 2017, the AOAO filed a motion to dismiss the Malabes' complaint.  With respect to Count I, the AOAO argued that the Malabes' wrongful foreclosure claim, based on their allegations that the AOAO improperly relied on HRS § 667-5 as a basis for the foreclosure, failed as a matter of law because (1) the Malabes' claim should have been raised as a defense to the foreclosure action, instead of belatedly raised as an affirmative cause of action; (2) the AOAO properly

---

[9]          **Power unaffected by transfer; surplus after sale.**  No sale or transfer by the mortgagor shall impair or annul any right or power of attorney given in the mortgage to the mortgagee to sell or transfer the mortgaged property, as attorney or agent of the mortgagor, except as otherwise provided by chapters 501 and 502. . . .

HRS § 667-10.

conducted the foreclosure pursuant to HRS § 514B-146 (2006)[10] and

HRS § 667-5; and (3) Hawai'i had not recognized a cause of action

for wrongful foreclosure.[11]

With respect to Count II, the AOAO argued that the Malabes'

UDAP claim (1) was time-barred by the four-year limitations

period set forth in HRS § 480-24 (2008),[12] which began to run "in

---

[10]    HRS § 514B-146 states in relevant part:

> **Association fiscal matters; lien for assessments.** [Repeal and reenactment on December 31, 2007. L 2005, c 93, § 7; L 2006, c 373, § 32.] (a) All sums assessed by the association but unpaid for the share of the common expenses chargeable to any unit shall constitute a lien on the unit . . . . The lien of the association may be foreclosed by action or by nonjudicial or power of sale foreclosure procedures set forth in chapter 667, by the managing agent or board, acting on behalf of the association, in like manner as a mortgage of real property.

(Bracketed material in original.)

[11]    Santiago was decided on January 15, 2016, and stated "we conclude that the Santiagos are entitled to restitution . . . from Tanaka's wrongful foreclosure of the Mortgage and subsequent sale of the Tavern." 137 Hawai'i at 158, 366 P.3d at 633. On November 16, 2016, this court ruled in another case that "[u]pon remand, the circuit court is to apply Santiago to determine an appropriate remedy for the wrongful foreclosure." Mount v. Apao, 139 Hawai'i 167, 180, 383 P.3d 1268, 1281 (2016). Before that, Kondaur Capital Corp. v. Matsuyoshi, 136 Hawai'i 227, 361 P.3d 454 (2015) discussed the predecessor statute to HRS § 667-5, and held that duties set forth in Ulrich v. Security Investment Co., 35 Haw. 158 (Haw. Terr. 1939), that a "mortgagee seeking to enforce a non-judicial foreclosure sale bears the burden of establishing that the sale was conducted in a manner that is fair, reasonably diligent, and in good faith and that an adequate price was procured for the property[,]" were applicable to HRS § 667-5. 136 Hawai'i at 229, 235-41, 361 P.3d at 456, 462-68. It appears that Hawai'i may have actually recognized a wrongful foreclosure claim as early as 1883, in Johnson v. Tisdale, 4 Haw. 605 (Haw. Kingdom 1883).

[12]    HRS § 480-24 states in relevant part:

> **Limitation of actions.** (a) Any action to enforce a cause of action arising under this chapter shall be barred unless commenced within four years after the cause of action accrues, except as otherwise provided in subsection (b) and section 480-22. For the purpose of this section, a cause
> (continued. . .)

or around December 2010/January 2011," and equitable tolling under HRS § 657-20 (1993) did not apply; and (2) failed as a matter of law because the AOAO did not conduct trade or commerce and the Malabes are not consumers in an adversarial foreclosure procedure.

In opposition, in summary, with respect to Count I, the Malabes argued that (1) wrongful foreclosure is a valid and recognized claim and is not required to be raised as a defense to a nonjudicial foreclosure, and their claim was timely raised within the applicable six-year statute of limitations period; and (2) because the AOAO was not authorized to foreclose pursuant to HRS § 667-5, the AOAO's compliance with the statute did not bar a claim of wrongful foreclosure.

Regarding Count II, the Malabes did not controvert the AOAO's assertion that the limitations period began in December 2010/January 2011, but instead argued that equitable tolling for fraudulent concealment applied.  The Malabes emphasized they were not accusing the AOAO of concealing the law, but rather of concealing a fact.

At the February 2, 2017 hearing on the motion to dismiss, the AOAO summarized the issue as being "whether 514B-146 [(2006)] gives the Association authority for the purposes of

_____

(. . .continued)
          of action for a continuing violation is deemed to accrue at
          any time during the period of the violation.

utilizing nonjudicial foreclosure."  The AOAO argued that HRS § 514B-146 gives broad authority to associations to use all forms of foreclosure available in HRS Chapter 667.  The Malabes argued that even if the AOAO could foreclose "in like manner as a mortgage," the AOAO was required to use statutes that explicitly allow their use because the AOAO did not have a power of sale.  The Malabes maintained that if the AOAO wanted to conduct a nonjudicial foreclosure, it would have to have been under Part II of HRS Chapter 667.[13]  They argued the AOAO could not rely on HRS § 667-5 because it did not have a mortgage containing a power of sale.  The Malabes also argued that the statute of limitations did not begin to run until they discovered the violations in 2016, arguing that the discovery rule is an equitable principle.

At the hearing, the circuit court indicated it was granting the motion to dismiss, but did not state the grounds for its ruling.

The circuit court granted the motion to dismiss in its entirety by an order filed on February 17, 2017.  Final judgment in favor of the AOAO was entered the same day.

**B.   Appeal to the ICA**

The Malabes appealed the dismissal of their complaint to the ICA.

---

[13]   See supra note 8.

11

The ICA agreed with the Malabes that Count I, the wrongful foreclosure claim, should not have been dismissed. See Malabe, SDO at 5–7. The ICA cited to Santiago, 137 Hawai'i at 154, 366 P.3d at 629, which held that "prior to its repeal in 2012, HRS § 667-5 authorized the non-judicial foreclosure of mortgaged property only when a power of sale is contained in a mortgage," as HRS § 667-5 "did not independently provide for a power of sale." Malabe, SDO at 3 (second emphasis added) (brackets, quotation marks, and footnote omitted). The ICA explained it had applied this holding in the context of apartment owner associations in Sakal, 143 Hawai'i at 225, 426 P.3d at 449, in which it held HRS § 667-5 "merely authorized a sale where such a power is independently provided by an agreement between the parties." Malabe, SDO at 4 (brackets and quotation marks omitted). The ICA observed "the AOAO did not argue that it had a power of sale under a mortgage or pursuant to its bylaws or some other agreement containing a power of sale." Id.

Further, the ICA rejected the AOAO's argument that HRS § 514B-146 authorized the AOAO to conduct a nonjudicial foreclosure on the Apartment pursuant to HRS § 667-5. Malabe, SDO at 5. The ICA reasoned that based on its plain language and legislative intent, HRS § 667-5 "did not grant a power of sale but merely authorized use of certain nonjudicial procedures in order to effect a foreclosure only when a power of sale was

12

contained in mortgage."  Id. (internal quotation marks and brackets omitted).  "[T]he phrase 'in like manner as a mortgage of real property' [contained in HRS §514B-146(a)] was intended to clarify that associations could avail themselves of less burdensome procedures, but was not a grant of heretofore non-existent statutory powers of sale."  Malabe, SDO at 6 (footnote omitted) (citing Sakal, 143 Hawai'i at 227, 426 P.3d at 451).  The ICA concluded that without a clear legislative act granting the "power to extrajudicially sell another person's property," it would not infer that one existed, and therefore the Malabes "stated a cognizable claim for wrongful foreclosure against the AOAO for which some relief may be granted."  Id.

     With respect to the circuit court's dismissal of Count II, the UDAP claim, the ICA affirmed.  The ICA concluded that this claim was barred pursuant to the plain language of HRS § 480-24(a)[14] governing UDAP claims, which provides, "[a]ny action to enforce a cause of action arising under this chapter shall be barred unless commenced within four years after the cause of action accrues."  Malabe, SDO at 8 (alteration in original).  Citing to federal case law that "a cause of action for unlawful business practices accrues upon occurrence of alleged violation, rather than when plaintiff discovers the violation[,]" the ICA concluded the Malabes' cause of action

---

[14]     See supra note 12.

13

accrued on or about December 17, 2010, when the AOAO "'collect[ed] [the] debt,' i.e., conducted the foreclosure sale and submitted the winning bid to purchase the Apartment." Malabe, SDO at 8 (alterations in original) (citing McDevitt v. Guenther, 522 F. Supp. 2d 1272, 1289 (D. Haw. 2007); Kersh v. Manulife Fin. Corp., 792 F. Supp. 2d 1111, 1122 (D. Haw. 2011); Heejoon Chung v. U.S. Bank, N.A., 250 F. Supp. 3d 658, 671–73 (D. Haw. 2017)).  The ICA concluded the Malabes' UDAP claim was therefore time-barred by HRS § 480-24 because they filed their complaint on December 13, 2016, nearly six years after the public sale and outside the limitations period.  See Malabe, SDO at 8.

In addition, the ICA concluded that equitable tolling did not apply to the Malabes' claims.  The Malabes had argued that the AOAO fraudulently concealed their cause of action because it had relied on HRS § 667-5 to conduct the public sale, i.e., because the AOAO implied, stated, and/or misrepresented that it was authorized to use HS § 667-5 and/or that it held a mortgage with a power of sale when it did not.  Malabe, SDO at 9.  The ICA rejected this argument, reasoning the AOAO's mere reliance on HRS § 667-5 did not constitute fraudulent concealment:

> As alleged in the Complaint, the AOAO "published notice that they would sell the Apartment at a public sale pursuant to Section 667-5."  The Malabes cite no authority for the proposition that reliance on a statutory authority, even if that reliance later proves to be wrong, constitutes fraudulent concealment, and we find none.  The Complaint

14

> contains no allegations that the AOAO concealed or
> misrepresented its use of HRS § 667-5. We decline to
> characterize the Malabes' later-developed, but cognizable
> and ultimately successful, legal theory as stating a claim
> for fraudulent concealment by the AOAO at the time the AOAO
> relied on HRS § 667-5. Therefore, we conclude that the
> Malabes failed to allege fraudulent concealment sufficient
> to state a claim to equitable tolling of the statute of
> limitations on their UDAP claim.

Malabe, SDO at 9-10.

Thus, the ICA vacated in part the circuit court's February 17, 2017 judgment with respect to its dismissal of Count I, affirmed in part with respect to the circuit court's dismissal of Count II, and remanded the case to the circuit court for further proceedings. See Malabe, SDO at 10.

## C. Applications for writs of certiorari

The AOAO filed an application for certiorari, presenting six questions:

> [1]. Did the ICA commit grave errors of law and fact when
> they analyzed a nonprofit AOAO's participation in a non-
> judicial foreclosure, the same as a for-profit financial
> institution's participation in a non-judicial foreclosure?
>
> [2]. Did the ICA commit grave errors of law and fact when
> they analyzed a for-profit financial institution's
> foreclosure of its contractual mortgage, and applied the
> same analysis to that of the nonprofit AOAO's foreclosure
> of its statutory lien?
>
> [3]. Did the ICA commit grave errors of law and fact by
> applying a negotiated contractual "power of sale" analysis,
> arising in the for-profit consumer context, to the
> nonprofit AOAO, who conducts a statutory lien foreclosure
> in accordance with the authority created by and the
> instructions contained in HRS § 514B-146 as provided by the
> [sic] Hawaii's legislature?
>
> [4]. Did the ICA commit grave errors of law and fact by
> holding that the AOAO lacked authority to conduct a non-
> judicial foreclosure absent an express written power of
> sale despite the plain language of HRS § 514B-10 providing
> that "the remedies provided by this chapter shall be
> liberally administered . . . ." and HRS § 514B-146,

15

providing that "[a]ll sums assessed by the association but unpaid for the share of the common expenses chargeable to any unit shall constitute a lien on the unit[,]" and that "[t]he lien of the association may be foreclosed by action or by nonjudicial or power of sale foreclosure procedures set forth in chapter 667"?

[5].  Did the ICA commit grave errors of law and fact in holding that Respondents had stated a cognizable claim for wrongful foreclosure against the AOAO, based on the 2010 non-judicial foreclosure sale of the unit owned by Respondents?

[6].  Did the ICA commit grave errors of law and fact in light of S.B. 551, which has passed two committees in the Senate and one committee in this House of Representatives, recognizing that "this Act confirms the legislative intent that associations should be able to use nonjudicial foreclosure to collect delinquencies without having specific authority to conduct nonjudicial foreclosures in an agreement with a delinquent owner or in the association's declaration or bylaws . . . ."?

(Ellipses and some alterations in original.)

The first five questions raise issues addressed by the circuit court and the ICA.  The sixth question was based on Senate Bill 551, which was then pending before the legislature.  As discussed below, we ordered supplemental briefing regarding Act 282.

The Malabes also filed an application for certiorari, presenting two questions:

1.    Whether the ICA gravely erred in holding that Petitioners' claim for unfair or deceptive acts or practices (hereafter "UDAP") is time-barred under HRS §480-24, by applying the occurrence rule rather than the discovery rule.

2.    Whether the ICA gravely erred in holding that Petitioners failed to allege fraudulent concealment sufficient to state a claim of equitable tolling of the statute of limitations on their UDAP claim.

16

## III.  Standards of review

### A.  Motions to dismiss

> A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [their][15] claim that would entitle them to relief.  We must therefore view a plaintiff's complaint in a light most favorable to [them] in order to determine whether the allegations contained therein could warrant relief under any alternative theory.  For this reason, in reviewing a circuit court's order dismissing a complaint . . . our consideration is strictly limited to the allegations of the complaint, and we must deem those allegations to be true.

Ah Mook Sang v. Clark, 130 Hawai'i 282, 290, 308 P.3d 911, 919 (2013) (ellipsis in original).

### B.  Statutory interpretation

"Statutory interpretation 'is a question of law reviewable de novo.'"  Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007).  When construing statutes, the court is governed by the following rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself.  Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
> When there is ambiguity in a statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning."

---

[15]     "They, them, and their" are used as singular pronouns when the gender identity of the person referred to is unknown or immaterial.

> Moreover, the courts may resort to extrinsic aids in determining legislative intent, such as legislative history, or the reason and spirit of the law.

Id. (citations omitted).

## IV.  Discussion

### A.   As the AOAO did not have a power of sale to conduct a nonjudicial foreclosure, the Malabes have stated a wrongful foreclosure claim

The first five questions in the AOAO's application can be crystallized as asking whether the Malabes have stated a wrongful foreclosure claim on the grounds the AOAO did not have authority to conduct a nonjudicial foreclose, which it purported to conduct pursuant to authority granted by HRS § 667-5, because it lacked a power of sale.  The ICA concluded the Malabes have stated a wrongful foreclosure claim, relying on its decision in Sakal to explain that HRS § 514B-146(a) did not "authorize an association to conduct a nonjudicial or power of sale foreclosure other than as provided in HRS chapter 667, which in turn does not authorize a nonjudicial power of sale foreclosure absent an otherwise existing power of sale."  Sakal, 143 Hawai'i at 228, 426 P.3d at 452.

As stated by the ICA in Sakal, that case presented

> difficult and consequential questions concerning whether an association of apartment owners must have a power of sale over its units in order to foreclose on a lien against a unit through the nonjudicial power of sale foreclosure procedures set forth in [HRS Chapter 667].  After an exhaustive review, we have concluded that over a number of years the Legislature has worked to craft workable, nonjudicial foreclosure procedures, available to associations as well as lenders, but at no point did the

18

> Legislature take up the issue of whether to enact a blanket
> grant of powers of sale over all condominiumized properties
> in Hawai'i.  Accordingly, we conclude that a power of sale
> in favor of a foreclosing association must otherwise exist,
> in the association's bylaws or another enforceable
> agreement with its unit owners, in order for the
> association to avail itself of the nonjudicial power of
> sale foreclosure procedures set forth in [HRS Chapter
> 667].

143 Hawai'i at 220-21, 426 P.3d at 444-45.  We do not repeat the entire analysis of the ICA's opinion.  In summary, however, the ICA held in Sakal that because no statutory power of sale existed, for an association to avail itself of the nonjudicial power of sale foreclosure procedures set forth in HRS Chapter 667, a power of sale in favor of a foreclosing association must otherwise exist in the association's bylaws or another enforceable agreement with its unit owners.

The AOAO does not argue that any written document provided it with a power of sale.  Rather, it argues that it had a statutory power of sale.  In other words, the AOAO challenges the ICA's ruling in Sakal that the legislature did not by statute grant to apartment associations a power of sale to nonjudicially foreclose on liens against apartment owners delinquent in paying their share of common expenses.

We hold the ICA did not err in reinstating Count I, the Malabes' wrongful foreclosure claim, for a nonjudicial foreclosure sale unauthorized by HRS § 667-5 based on Sakal. Sakal correctly held that in order for an association to utilize the nonjudicial power of sale foreclosure procedures set forth

19

in HRS Chapter 667, a power of sale in its favor must have existed in association bylaws or in another enforceable agreement with unit owners.  143 Hawai'i at 220-21, 426 P.3d 444-45.  Therefore, although the AOAO conducted its nonjudicial foreclosure of the Malabes' Apartment in this case pursuant to HRS § 667-5, as compared to Part II of HRS Chapter 667 at issue in Sakal, the result is the same.  In addition, as discussed below, Act 282 does not affect this holding.

**1.     The AOAO did not have authority to conduct a nonjudicial foreclosure pursuant to HRS § 667-5**

The AOAO's notice to the Malabes stated that it would be foreclosing pursuant to HRS § 667-5 and HRS Chapters 514A and 514B.  The AOAO lacked a power of sale and was therefore not authorized to conduct a nonjudicial foreclosure sale.[16]

As of the date of the Malabes' nonjudicial foreclosure, HRS § 667-5 provided in relevant part as follows:

> **§667-5  Foreclosure under power of sale; notice; affidavit after sale.**  (a)  When a power of sale is contained in a mortgage, and where the mortgagee, the mortgagee's successor in interest, or any person authorized by the power to act in the premises, desires to foreclose under power of sale upon breach of a condition of the mortgage, the mortgagee, successor, or person shall be represented by an attorney who is licensed to practice law in the State and is physically located in the State.  The attorney shall:

---

[16]     We also note that, after Sakal, and before this opinion, Judge Leslie Kobayashi of the United States District Court for the District of Hawai'i had also ruled that, as a matter of law, an association without a power of sale was not authorized to utilize HRS § 667-5 to conduct a nonjudicial foreclosure.  Galima v. Ass'n of Apartment Owners of Palm Court, CIVIL 16-00024 LEK-KSC, 2018 WL 6841818 (D. Haw. Dec. 31, 2018).

20

> (1)  Give notice of the mortgagee's, successor's, or person's intention to foreclose the mortgage . . . ; and
>
> (2)  Give any notices and do all acts as are authorized or required by the power contained in the mortgage.

(Emphasis added.)

"First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." Citizens Against Reckless Dev., 114 Hawaiʻi at 193, 159 P.3d at 152.  The language of the statute and its plain and obvious meaning is that HRS § 667-5 allowed for a nonjudicial foreclosure when a power of sale is contained in a mortgage. The AOAO did not have a mortgage on the Malabes' Apartment. Thus, the AOAO could not conduct a nonjudicial foreclosure pursuant to HRS § 667-5.[17]

## 2.  HRS § 514B-146 did not provide the AOAO with the power of sale required to conduct a nonjudicial foreclosure

The AOAO's notice of nonjudicial foreclosure also cited to HRS Chapters 514A and 514B as authority for its action.[18]

---

[17]    The concurrence and dissent agrees that the AOAO in this case was not authorized to conduct a nonjudicial foreclosure sale pursuant to HRS § 667-5.

[18]    As noted by the ICA in Sakal, HRS Chapter 514A applied to all condominiums created before July 1, 2006, except as provided in sections 514B-22 and 514B-23, and with other inapplicable exceptions.  143 Hawaiʻi at 226, 426 P.3d at 450.  HRS Chapter 514B applies to all condominiums created after July 1, 2006, pursuant to HRS § 514B-21 (2006), and HRS § 514B-22

(continued. . .)

Specifically, the AOAO argues that HRS § 514B-146(a), which is identical to the former HRS § 514A-90(a) that governed condominiums built before July 1, 2006 until January 1, 2019, when HRS Chapter 514B became applicable to all condominiums,[19] authorized it to use the nonjudicial foreclosure procedures set forth in HRS § 667-5.[20]  As of the date of the AOAO's nonjudicial foreclosure of the Malabes' Apartment, HRS § 514B-146(a) provided in relevant part as follows:

> **[§514B-146]  Association fiscal matters; lien for assessments.** . . . .  (a)  All sums assessed by the association but unpaid for the share of the common expenses chargeable to any unit shall constitute a lien on the unit with priority over all other liens, except:
>
>     (1)  Liens for taxes and assessments lawfully imposed by governmental authority against the unit; and

---

(. . .continued)
        provides that certain enumerated provisions in HRS Chapter 514B, including HRS § 514B-146, apply to all condominiums created before July 1, 2006, but "only with respect to events and circumstances occurring on or after July 1, 2006," provided that their application does not "invalidate existing provisions of the declaration, bylaws . . . or be an unreasonable impairment of contract."  HRS § 514B-22 (2006).

Id. (ellipsis in original).

    HRS § 514B-22 was repealed by 2017 Haw. Sess. Laws Act 181, § 4, effective January 1, 2019, and on January 1, 2019, HRS Chapter 514A was repealed and HRS Chapter 514B now applies to all condominiums in Hawai'i regardless of their creation date, "provided that such application shall not invalidate existing provisions of the declaration, bylaws, condominium map, or other constituent documents of those condominiums if to do so would invalidate the reserved rights of a developer."  143 Hawai'i at 226, n.12, 426 P.3d at 450, n.12 (quoting HRS § 514B-21 (Supp. 2017)).

[19]    See supra note 18.

[20]    In her December 31, 2018 Galima decision, supra note 16, Judge Kobayashi also rejected this argument.  2018 WL 6841818, at *9.

> (2) All sums unpaid on any mortgage of record that was recorded prior to the recordation of a notice of a lien by the association, and costs and expenses including attorneys' fees provided in such mortgages.
>
> The lien of the association may be foreclosed by action or by nonjudicial or power of sale foreclosure procedures set forth in chapter 667, by the managing agent or board, acting on behalf of the association, in like manner as a mortgage of real property.

(Emphases added.) The AOAO argues that, pursuant to this language, it was authorized to conduct a nonjudicial foreclosure pursuant to HRS § 667-5.

As noted by the ICA in Sakal, however, HRS § 514B-146(a), which was identical to HRS § 514A-90(a), only provided associations with access to nonjudicial power of sale procedures, and "associations were not being granted heretofore non-existent statutory powers of sale[.]" Sakal, 143 Hawai'i at 227, 426 P.3d at 451. The text of HRS §§ 514A-90(a) and/or 514B-146(a) refers to an association's ability to conduct a nonjudicial foreclosure in the context of the "procedures set forth in chapter 667 . . . in like manner as a mortgage of real property." HRS § 541A-90(a) (emphasis added); HRS § 514B-146(a) (emphasis added). There is no grant of a power of sale in either statute. And as we held in Santiago, "no state statute[, including Part II of HRS Chapter 667,] creates a right in mortgagees to proceed by non-judicial foreclosure; the right is created by contract." 137 Hawai'i at 155, 366 P.3d at 630 (emphasis added).

As explained by the ICA in Sakal, HRS § 514A-90(a) was amended in 1999 to the version of HRS 514B-146(a) quoted above. 143 Hawaiʻi at 226, 426 P.3d at 450.  Although from 1999, pursuant to HRS §§ 514A-90(a) and 514B-146(a), associations could avail themselves of HRS Chapter 667 nonjudicial or power of sale procedures, like mortgagees, it is clear that mortgagees could conduct a nonjudicial power of sale only if the subject mortgage contained a power of sale.  143 Hawaiʻi at 227, 426 P.3d at 451 (citing HRS § 667-5; Part II of HRS Chapter 667; Lee, 121 Hawaiʻi at 292, 218 P.3d at 780 ("no state statute creates a right in mortgagees to proceed by non-judicial foreclosure; the right is created by contract")).

Thus, as noted by the ICA:

> The 1999 amendment to HRS § 514A-90 did not purport to enact a blanket grant of powers of sale to all associations over all apartments/units within those associations.  There is nothing in the legislative history of Act 236 of 1999 to suggest that a grant of powers of sale was even contemplated.  The text of Act 236 of 1999 specifically states that this amendment was intended to clarify that associations could avail themselves of less burdensome procedures, i.e., the alternative power of sale foreclosure procedures enacted the prior year.  See 1999 Haw. Sess. Laws Act 236, § 1 at 723-24.  As stated earlier, we will not infer that the power to extrajudicially sell another person's property was granted, in the absence of a clear legislative act doing so.[21]

---

[21]    As held by Sakal, the legislature's 2012 amendments to the foreclosure law also did not create a power of sale for associations.  143 Hawaiʻi at 225, 426 P.3d at 449.  The 2012 amendments were based on recommendations of a legislatively created foreclosure task force.  Legislative Reference Bureau, Final Report of the Mortgage Foreclosure Task Force to the Legislature for the Regular Session of 2012 6 (2011), available at https://lrb.hawaii.gov/wp-content/uploads/2011_FinalReportOfTheMortgageForeclosureTaskForce.pdf.  The task force recommendations included an amendment to "chapter 667 [] adding a new part to establish an alternate power of sale process

(continued. . .)

Sakal, 143 Hawai'i at 227, 426 P.3d at 451.

As further explained by Sakal, in contrast to the Hawai'i statutory scheme, other states have included a statutory grant of the power of sale explicitly in the language of their statutes.  143 Hawai'i at 228, 426 P.3d at 452 (citing D.C. Code Ann. § 42-1903.13(c)(1) (West 2017) ("The unit owners' association shall have the power of sale to enforce a lien for an assessment against a condominium unit if an assessment is past due." (emphasis added.)); Minn. Stat. § 515B.3-116(h)(1) (2017) ("[T]he association's lien may be foreclosed in a like manner as a mortgage containing a power of sale pursuant to chapter 580, or by action pursuant to chapter 581.  The association shall have a power of sale to foreclose the lien pursuant to chapter 580." (emphasis added.)); Tex. Prop. Code Ann. § 82.113(d) (West 2013) ("By acquiring a unit, a unit owner grants to the association a power of sale in connection with the association's lien." (emphasis added.)); N.C. Gen. Stat. Ann. § 47F-3-116(f) (West 2013) ("[T]he association, acting through the

---

(. . .continued)
specifically for condominium and other homeowner associations and modeled after the process set forth in part II of chapter 667[.]"  Id. at 36.  The new part was titled "Association Alternate Power of Sale Foreclosure Process" and contained fourteen new sections outlining the procedures for a power of sale foreclosure.  Id. at 36-53.  These sections comprise Part VI of HRS chapter 667.  The task force's recommendations were adopted by the legislature.  See generally 2012 Haw. Sess. Laws Act 182.  The 2012 amendment to section 514A-90 did not grant associations a power of sale, but instead codified procedures for associations to follow when conducting a nonjudicial foreclosure under a power of sale.

executive board, may foreclose a claim of lien in like manner as a mortgage or deed of trust on real estate under power of sale, as provided in Article 2A of Chapter 45 of the General Statutes. . . .  The association shall be deemed to have a power of sale for purposes of enforcement of its claim of lien."
(emphasis added.))).[22]

As noted by the ICA, the Hawai'i legislature did not use language similar to that of the above-quoted state codes in either HRS Chapter 514A or 514B, nor did the legislative history of these chapters provide any indication that the legislature provided "a blanket grant of powers of sale to all associations over all apartments/units within those associations."  Sakal, 143 Hawai'i at 227, 426 P.3d at 451.[23]

---

[22]    As noted in Sakal, these statutes from other states clearly and unequivocally provide associations with a power of sale to enforce their liens.  143 Hawai'i at 228, 426 P.3d at 452.  The dissent asserts that HRS § 667-40 (2016) and HRS § 514B-146(a) constituted similar statutory authority for associations to conduct nonjudicial foreclosures under Part II of HRS Chapter 667.  HRS § 667-40, which is within Part II of Chapter 667, however, provided that Part II of HRS Chapter 667 procedures can be followed if "a law . . . authorizes, permits, or provides for . . . a power of sale foreclosure . . . or a nonjudicial foreclosure."  This statute obviously requires another law that would allow an association to conduct a nonjudicial foreclosure.  The dissent asserts that HRS § 514B-146(a) is that law.  That statute, however, provided in 2010 (the time of the AOAO's nonjudicial foreclosure of the Malabes' Apartment) that "[t]he lien of the association of apartment owners may be foreclosed by action or by nonjudicial or power of sale foreclosure procedures set forth in chapter 667, by the managing agent or board of directors, acting on behalf of the association of apartment owners, in like manner as a mortgage on real property."  As correctly opined by the ICA in Sakal, this statute, unlike those of other states, does not provide a "power" of sale.  Id.

[23]    As explained in supra note 8, Sakal addressed an association's nonjudicial foreclosures under Part II of HRS Chapter 667; the AOAO in this
(continued. . .)

(. . .continued)

case asserted authority to conduct a nonjudicial foreclosure under the more simple "process" of HRS § 667-5. As further explained in <u>Sakal</u>:

> Part II of HRS chapter 667 was enacted through Act 122 of 1998, in order to address certain shortcomings in HRS § 667-5 (repealed in 2012). HRS § 667-40, which is applicable only to time share plans, condominium property regimes, and agreements of sale, remain[ed] in effect as enacted in 1998 (with subsequent amendments), notwithstanding the addition of Part VI, as well as Part IV, which pertains to the foreclosure of a time share interest where a time share interest mortgage, loan, agreement, or contract contains a power of sale.

143 Hawai'i at 224 n.8, 426 P.3d at 448 n.8

Part II of HRS Chapter 667's "<u>processes</u>" include foreclosure notices, notices of default, recordation of notices of default, cures of default, places of public sale, cancellations of sale, authorized bidders, conveyances, distributions of sale proceeds, affidavits after sale, recordation of affidavits, and public notice. <u>See</u> HRS §§ 667-21.5 through 667-41. And although HRS § 667-40 provides that "[a] power of sale foreclosure under [Part II of HRS Chapter 667] may be used in certain non-mortgage situations where a law or a written document contains, authorizes, permits, or provides for a power of sale, a power of sale foreclosure, a power of sale remedy, or a nonjudicial foreclosure[,]" by its own language, this statute requires that such a "law" or "written document" otherwise exist. As further noted by the ICA with respect to HRS § 667-40:

> If a law provided powers of sale to all associations, there would be no need to reference other written documents; however, the language suggests that such a law might exist, but we found none. We note, however, that the nonjudicial power of sale procedures in Part II of HRS chapter 667 are expressly made available to associations through HRS § 667-40, where such powers exist, but other parts of Part II are an ill fit for associations. <u>See</u>, <u>e.g.</u>, HRS § 667-32(a)(1) (requiring "the foreclosing mortgagee" to file an affidavit under penalty of perjury stating, <u>inter alia</u>, "that the power of sale foreclosure was made pursuant to the power of sale provision in the mortgage"). Especially in light of other aspects of Part II of HRS chapter 667 that cannot be read literally as to association foreclosures, we conclude that the ambiguous references to "a law or written document" is too thin a reed on which to support a statutory power of sale. Nevertheless, we delved further into the history of statutory lien rights of associations, from when they were first enacted as part of the first Horizontal Property Act in 1961, when they were amended in 1963, and through the present. <u>See</u> 1961 Haw. Sess. Laws Act 180, § 15 at 276; 1963 Haw. Sess. Laws Act 101, § 22 at 88; HRS § 514-24(a) (1968) (repealed in 1977); HRS §§ 514A-90 and 514B-146. Nothing in the legislation or legislative history of Hawai'i

(continued. . .)

27

For all of these reasons, and for the additional reasons contained in the ICA opinion, we hold that Sakal was correctly decided.[24]

---

(. . .continued)
> condominium law supports a conclusion that, at any time, the Legislature enacted or intended to enact a statute granting powers of sale over all condominiums in the State to their respective associations.

143 Hawai'i at 228 n.18, 426 P.3d at 452 n.18.

[24] We also adopt the ICA's analysis of relevant legislative history. Sakal, 143 Hawai'i at 223-28, 426 P.3d at 448-53. We further address an assertion not addressed by the ICA's Sakal opinion. The dissent states:

> [T]he differences between a nonjudicial and a judicial foreclosure, and the advantages that the former confers, are procedural:
>
> > [A foreclosure pursuant to HRS § 667-5 (Supp. 2010)] is relatively quick and inexpensive. It does not require a lengthy time period between the notice of default and foreclosure sale, and does not require court costs and legal fees associated with discovery and drafting of pleadings.
>
> Lee, 121 Hawai'i at 292, 218 P.3d at 780 (quoting Georgine W. Kwan, Mortgagor Protection Laws: A Proposal for Mortgage Foreclosure Reform in Hawai'i, 24 U. Haw. L. Rev. 245, 253 (2011)); see also Restatement (Third) of Property: Mortgages § 8.2 (Am. Law Inst. 2020) ("The underlying theory of power of sale foreclosure is that by complying with the statutory requirements, the mortgagee accomplishes the same purposes achieved by judicial foreclosure without the substantial additional burdens that the latter type of foreclosure entails.").

(Second alteration in original.)

The "underlying theory" stated above does not comport with reality; the differences between nonjudicial foreclosures pursuant to HRS § 667-5, at issue in this case, as well as Part II of HRS Chapter 667 at issue in Sakal, and judicial foreclosures are not merely "procedural," as posited by the dissent. The Malabes not only lost their home; they were left with liability on the mortgage they had procured to buy their home. AOAOs that have conducted nonjudicial foreclosures have been able to obtain title to condominium units for much less than fair market value, while leaving the homeowner responsible for the mortgage. Although judicial foreclosures may take longer and require more expense, they are conducted under the

(continued. . .)

### 3. Other arguments do not support a conclusion that the AOAO had a power of sale

In its amicus brief, the Hawaii Council of Associations of Apartment Owners d.b.a. Hawaii Council of Community Associations ("Council") raises additional arguments in support of the AOAO.

The Council submits that an interpretation of Hawai'i's condominium laws "must be imaginative and progressive rather than restrictive[,]" quoting State Savings and Loan Ass'n v. Kauaian Development Co., 50 Haw. 540, 552, 445 P.2d 109, 118-19

---

(. . .continued)

supervision of a judge who recognizes that "[m]ortgage foreclosure is a proceeding equitable in nature and is thus governed by the rules of equity." HawaiiUSA Fed. Credit Union v. Monalim, No. SCWC-16-0000807, at 18, 2020 WL 2079890 (Haw. April 30, 2020). Thus, although a judicial foreclosure can also result in continuing mortgage liability, a judge has discretion to disallow association foreclosure and instead require an owner to pay the amount owed an association to avoid forfeiture of equity along with continuing mortgage liability, and can suggest methods of obtaining such funds. And in nonjudicial foreclosures, homeowners might lose the benefit of our holding in Monalim, which adopted the majority rule and held that "equitable considerations of foreclosure proceedings warrant affording mortgagees the right to apply the fair market value of mortgaged property towards the amount due on the mortgage[.]" Id. at 49.

Also, the dissent's citation to HRS § 667-92 (2016)'s disallowance of association deficiency judgments in certain situations is inapposite, as that statute is within Part VI of HRS Chapter 667 and only applies to foreclosures conducted pursuant to that part. HRS § 667-92(a) ("When a unit owner has failed to pay an assessment, and when the association intends to conduct a power of sale foreclosure under this part . . . ."). Also, even before Act 282, if an association had attempted to proceed with a nonjudicial foreclosure under Part VI without court approval, the owner had a one year right of redemption to reobtain the unit by paying the delinquency owed. HRS § 667-92(f)(2). In addition, before Act 282, Part VI contained numerous other protections for owners, such as the right to submit a payment plan that, if reasonable, could not be rejected by the association, as well as a sixty day right of cure. HRS § 667-92(c). According to the Malabes' complaint, there were only 18 days between the AOAO's December 17, 2010 notice of publication of sale and the January 4, 2011 quitclaim deed the AOAO executed with itself as grantor and grantee, through which the Malabes lost title. This obviously never could have happened in a judicial foreclosure, as an owner would have had twenty days after service of a foreclosure complaint to respond. See HRCP Rule 12(a). Thus, the differences between nonjudicial foreclosures in Parts I and II of HRS Chapter 667 and judicial foreclosures are much more than procedural.

29

(1968).  It asserts that HRS § 514B-146(a) is a "remedial" statute "because [it] provide[s] the remedy of nonjudicial or power of sale foreclosures," and as such, the remedy provided in HRS Chapter 514B is to be "liberally administered" pursuant to HRS § 514B-10 (2006).[25]

The Malabes argued below that the focus of HRS § 514B-10 is on an owner who has been harmed by a violation of any provision of HRS Chapter 514B, but based on its plain language, HRS § 514B-10 applies to any "aggrieved party."  For the reasons explained above, however, the "remedy" sought by the AOAO and the Council simply do not exist as a matter of law.[26]

---

[25]     HRS § 514B-10 provides:

**§514B-10  Remedies to be liberally administered.**
(a)  The remedies provided by this chapter shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed.  Punitive damages may not be awarded, however, except as specifically provided in this chapter or by other rule of law.
     (b)  Any deed, declaration, bylaw, or condominium map shall be liberally construed to facilitate the operation of the condominium property regime.
     (c)  Any right or obligation declared by this chapter is enforceable by judicial proceeding. . . .

The Council also argues that HRS §§ 514A-90 and 514A-82(b) are remedial statutes, but the parties do not refer to HRS § 514A-90 or HRS § 514A-82(b) as bases for the AOAO's foreclosure upon the Apartment.  These sections were repealed in 2004.

[26]     Chapter 514B does contain some remedies for owners that could have been implicated in this context of the assertions in the Malabes' complaint.  The AOAO in this case does not argue that the declaration or the by-laws provided a power of sale for any non-payment of association fees or assessment.  Thus, owners may not have known that their associations would later pursue nonjudicial foreclosures pursuant to HRS § 667-5 for non-payment of association fees.  Owners could therefore have been denied possible remedies under Chapter 514B if they were not provided notice that if they failed to
(continued. . .)

The Council also asserts the ICA's failure to address HRS § 514A-82(b)(13) constitutes grave error.  The Council argues that this statute specifically incorporated into the bylaws of all condominium projects existing as of January 1, 1988, and all condominium projects created after that date the provision that "[a] lien created pursuant to section 514A-90 may be enforced by the association in any manner permitted by law, including nonjudicial or power of sale foreclosure procedures authorized by chapter 667."  HRS § 514A-82(b)(13) (repealed 2004).  Thus, according to the Council, HRS § 514A-82(b)(13) provides the authority to an association to foreclose pursuant to Part I of HRS Chapter 667.

HRS § 514A-82(b)(13), added by Act 236 of 1999, is within Part V of Chapter 514A governing "Condominium Management."  The provision states that an association's bylaws "shall be consistent with the following provisions: . . . (13) A lien created pursuant to section 514A-90 may be enforced by the

_____

(. . .continued)
pay fees or assessments due their association, the association could utilize the expedited nonjudicial foreclosure process of HRS § 667-5.  Without being informed of that possibility, owners could then lose their homes and any equity therein, and end up with liability on their mortgages.  They would thus be deprived of "likely [] the largest 'investment' a person in Hawai'i may make in a lifetime[,]" Cieri v. Leticia Query Realty, Inc., 80 Hawai'i 54, 67, 905 P.2d 29, 42 (1995), which is in their home.  Under these circumstances, owners may have been deprived of statutory remedies of a buyer's thirty-day right to cancel pursuant to HRS § 514B-86 (2006) after reviewing the declaration and bylaws, or of an owner's right to require compliance with the by-law amendment process of HRS § 514B-108 (2006), should the association have sought to amend its by-laws to allow nonjudicial foreclosures.

association in any manner permitted by law, including nonjudicial or power of sale foreclosure procedures authorized by chapter 667[.]" The statute did not, however, create a power of sale; rather, it stated that the lien "may be enforced" "by nonjudicial or power of sale procedures authorized by chapter 667" where "permitted by law." This ends up being a circular argument, as a nonjudicial foreclosure was not "permitted by law" for the reasons explained above.

The Council also argues that HRS §§ 514A-82(b)(13), 514A-90, and 514B-146 use language similar to an ordinance that authorizes the County of Honolulu Honolulu to conduct nonjudicial foreclosure on real property tax liens. The Council asserts the legislature therefore must have granted associations authority to conduct nonjudicial foreclosures. The Council compares the language used in HRS §§ 514A-82 and 514A-90 to the language of the Revised Ordinances of Honolulu ("ROH") § 8-5.2 (1983). It argues that the phrase "may be sold by way of foreclosure without suit" in ROH § 8-5.2 authorizes nonjudicial foreclosures, and that the similar language in HRS Chapter 514A likewise authorizes the use of nonjudicial foreclosures.

ROH § 8-5.2 provides in relevant part:

> All real property on which a lien for taxes exists may be sold by way of foreclosure without suit by the director, and in case any lien, or any part thereof, has existed thereon for three years, shall be sold by the director at public auction to the highest bidder, for cash, to satisfy the lien[.]

We could find no appellate cases citing this ordinance. HRS §§ 514A-82 and 514A-90 provide, however, that associations may enforce liens by using "nonjudicial or power of sale foreclosure <u>procedures</u> authorized by chapter 667" and "nonjudicial or power of sale foreclosure <u>procedures</u> set forth in chapter 667[.]" (Emphasis added.) Thus, the language of ROH § 8-5.2 is not analogous to the language of HRS §§ 514A-82 and 514A-90.

In summary, <u>Sakal</u> was correctly decided. Thus, the ICA did not err in reinstating Count I, the Malabes' wrongful foreclosure claim, based on its decision in <u>Sakal</u>.

### 4. Act 282 of 2019 does not impact the nonjudicial foreclosure conducted by the AOAO on the Malabes' Apartment

As noted earlier, Act 282 came into effect on July 10, 2019.[27] We therefore ordered supplemental briefing on the following issue: "What effect, if any, does SB551, CD1 of 2019 have on this case?"[28]

We hold that the statutory changes in Act 282 do not affect the Malabes' wrongful foreclosure claim against the AOAO, which conducted its foreclosure pursuant to Part I of HRS Chapter 667.

---

[27] See <u>supra</u> note 3.

[28] Pursuant to Hawai'i Rules of Appellate Procedure ("HRAP") Rule 44 (2016), the Malabes notified Attorney General Clare E. Connors that they challenged the constitutionality of Act 282. The Attorney General did not file a brief or indicate she wished to appear in this matter.

For this reason, we need not address the constitutionality of Act 282 with respect to Part VI of Chapter 667.  We also discuss, however, the United States District Court's ruling in <u>Galima</u>.[29]

### a.    Act 282

Act 282 states in its entirety:

> SECTION 1.  The legislature finds that "Hawaii was the first state to enact statutory provisions enabling the creation of condominiums."  <u>State Savings & Loan Association v. Kauaian Development Company</u>, 50 Haw. 540, 546, 445 P.2d 109, 115 n.8 (1968).  Brought into being by the legislature through Act 180, Session Laws of Hawaii 1961, condominiums are "creature[s] of statute," <u>State Savings & Loan Association</u>, 50 Haw. at 546, 445 P.2d at 115, which are governed by <u>statutes</u>, as well as their governing documents.
>
> The legislature finds that condominiums provide a valuable housing resource in Hawaii, especially with limited space available for new development.  The structure of condominium ownership requires each owner to share in the total cost of maintaining common areas such as building exteriors, landscaping, pool, and recreation rooms, in addition to paying insurance premiums.  All owners pay for such maintenance through fees or dues.  The legislature further finds that it is crucial that condominium associations be able to secure timely payment of dues to provide services to all residents of a condominium community.
>
> In 1999, the legislature noted "that more frequently associations of apartment owners are having to increase maintenance fee assessments due to increasing delinquencies and related enforcement expenses.  This places an unfair burden on those non-delinquent apartment owners who must bear an unfair share of common expenses . . . ."  Moreover, lengthy delays in the judicial foreclosure process exacerbated the financial burden on association owners.  The legislature determined that associations needed a more efficient alternative, such as power of sale foreclosures, to provide a remedy for recurring delinquencies.
>
> Additionally, the legislature finds that condominium associations, since 1999, have been authorized to conduct nonjudicial foreclosures regardless of the presence or the absence of power of sale language in an association's governing documents.  Beginning in 1998 with the passage of Act 122, Session Laws of Hawaii 1998, and codified in

---

[29]    Like the Malabes, the <u>Galima</u> plaintiffs' condominium had been sold through a nonjudicial foreclosure conducted pursuant to Part I of Chapter 667.

section 667-40, Hawaii Revised Statutes, condominium associations were authorized to conduct nonjudicial foreclosures if a "law or written document contains, authorizes, permits, or provides for a power of sale, a power of sale foreclosure, a power of sale remedy, or a nonjudicial foreclosure."  However, in 1999, the legislature passed Act 236, Session Laws of Hawaii 1999, "[c]larify[ing] that associations of apartment owners may enforce liens for unpaid common expenses by non-judicial power of sale foreclosure procedures, as an alternative to legal action" by:

    (1)  Specifying that condominium associations may foreclose liens by nonjudicial or power of sale foreclosure within the statute governing the priority of a condominium association lien (section 514A-90, Hawaii Revised Statutes (repealed January 1, 2019)); and

    (2)  Incorporating into the bylaws of all condominium associations a provision authorizing condominium associations to enforce liens by nonjudicial or power of sale foreclosure pursuant to chapter 667, Hawaii Revised Statutes (section 514A-82, Hawaii Revised Statutes (repealed January 1, 2019)).

Thus, Act 236, Session Laws of Hawaii 1999, provided a statutory grant of power and an incorporation into written documents authorizing condominium associations to utilize nonjudicial foreclosure under sections 667-5 (repealed June 28, 2012) and 667-40, Hawaii Revised Statutes, to enforce their liens.

The legislature also finds that this intent was not abrogated by the recodification of chapter 514A, Hawaii Revised Statutes.  First, through Act 164, Session Laws of Hawaii 2004, the language of section 514A-90, Hawaii Revised Statutes, was incorporated with limited amendments while retaining the authorization that condominium associations may foreclose liens by nonjudicial or power of sale foreclosure.  Second, while the new statute governing bylaws no longer contained a provision authorizing condominium associations to enforce liens by nonjudicial or power of sale foreclosure, it was not removed out of an intention to revoke this authority from condominium associations but rather out of a desire to enhance the clarity of the condominium law.  As stated in the Final Report to the Legislature:  Recodification of Chapter 514A, Hawaii Revised Statutes (Condominium Property Regimes), the "statutory requirements for condominium governing documents should be minimized while incorporating certain provisions . . . in more appropriate statutory sections."

Further, the legislature finds that the intent was not abrogated by the creation of the nonjudicial foreclosure process specifically for condominium associations, codified as part VI of chapter 667, Hawaii Revised Statutes, through Act 182, Session Laws of Hawaii 2012.  This is evidenced by the lack of a provision constricting its application similar to the language in section 667-40, Hawaii Revised Statutes.

Since the enactment of part VI of chapter 667, Hawaii Revised Statutes, associations have conducted nonjudicial foreclosures as part of their efforts to collect delinquencies and sustain their financial operations.  Associations have done so subject to the restrictions on nonjudicial foreclosures and other collection options imposed by the legislature, which include:

    (1)   Prohibiting the use of nonjudicial foreclosure to collect fines, penalties, legal fees, or late fees;

    (2)   Requiring associations to give an owner sixty days to cure a default before proceeding with the nonjudicial foreclosure and to accept reasonable payment plans of up to twelve months; and

    (3)   Requiring associations to provide owners with contact information for approved housing counselors and approved budget and credit counselors.

However, the intermediate court of appeals in <u>Sakal v. Association of Apartment Owners of Hawaiian Monarch</u>, 143 Haw. 219, 426 P.3d 443 (2018), held that the legislature intended that associations can only conduct nonjudicial foreclosures if they have specific authority to conduct nonjudicial foreclosures in their declaration or bylaws or in an agreement with the owner being foreclosed upon.

The legislative history indicates this was not the intent of the legislature in 1999, nor in legislatures that have made subsequent amendments.  Therefore, this Act confirms the legislative intent that condominium associations should be able to use nonjudicial foreclosure to collect delinquencies regardless of the presence or absence of power of sale language in an association's governing documents.

This Act also provides an additional consumer protection by requiring the foreclosing association to offer mediation with any notice of default and intention to foreclose and the procedures when mediation is chosen by the consumer.

SECTION 2.  Chapter 514B, Hawaii Revised Statutes, is amended by adding a new section to be appropriately designated and to read as follows:

"**§514B-__    Association fiscal matters; supplemental nonjudicial foreclosure notices; restrictions on power of sale.**  (a)  Any notice of default and intention to foreclose given by an association under section 667-92(a) shall, in addition to the requirements of that section, also include a statement that the unit owner may request mediation by delivering a written request for mediation to the association by certified mail, return receipt requested, or hand delivery within thirty days after service of a notice of default and intention to foreclose on the unit owner.

If the association does not receive a request for mediation within the thirty-day period, the association may proceed with nonjudicial or power of sale foreclosure, subject to all applicable provisions of this chapter and

chapter 667.  If the association receives a request for mediation, as set forth in this subsection, from a unit owner within thirty days after service of a notice of default and intention to foreclose upon the unit owner, the association shall agree to mediate and shall be prohibited from proceeding with nonjudicial or power of sale foreclosure until the association has participated in the mediation or the time period for completion of the mediation has elapsed.  The mediation shall be completed within sixty days of the date upon which the unit owner delivers a request for mediation upon the association; provided that if the mediation is not commenced or completed within sixty days or the parties are unable to resolve the dispute by mediation, the association may proceed with nonjudicial or power of sale foreclosure, subject to all applicable provisions of this chapter and chapter 667.

(b)  In addition to the wording required by section 667-92(b), any notice of default and intention to foreclose given by an association under section 667-92(a) shall also contain wording substantially similar to the following in all capital letters and printed in not less than fourteen-point font:

"THIS NOTICE PERTAINS TO AMOUNTS DUE AND OWING TO THE ASSOCIATION FOR WHICH THE ASSOCIATION HAS A STATUTORY OR RECORDED LIEN.  THIS NOTICE DOES NOT PERTAIN TO OBLIGATIONS OWED BY YOU TO OTHER CREDITORS, INCLUDING ANY OUTSTANDING MORTGAGE DEBT.  YOU SHOULD CONSULT YOUR OTHER CREDITORS, INCLUDING YOUR MORTGAGEES, IF ANY, AS TO THE EFFECT THE FORECLOSURE OF THE ASSOCIATION'S LIEN WILL HAVE ON YOUR OTHER OUTSTANDING DEBTS."

(c)  The association's power of sale provided in section 514B-146(a) may not be exercised against:

(1)  Any lien that arises solely from fines, penalties, legal fees, or late fees, and the foreclosure of any such lien shall be filed in court pursuant to part IA of chapter 667;

(2)  Any unit owned by a person who is on military deployment outside of the State of Hawaii as a result of active duty military status with any branch of the United States military.  The foreclosure of any such lien shall be filed in court pursuant to part IA of chapter 667, this subsection shall not apply if the lien of the association has been outstanding for a period of one year or longer; or

(3)  Any unit while the nonjudicial or power of sale foreclosure has been stayed pursuant to section 667-92(c)."

SECTION 3.  Section 514B-146, Hawaii Revised Statutes, is amended by amending subsection (a) to read as follows:

"(a)  All sums assessed by the association but unpaid for the share of the common expenses chargeable to any unit shall constitute a lien on the unit with priority over all other liens, except:

(1)  Liens for real property taxes and assessments lawfully imposed by governmental authority against the unit; and

(2)  Except as provided in subsection (j), all sums unpaid on any mortgage of record that was

recorded prior to the recordation of a notice of a lien by the association, and costs and expenses including attorneys' fees provided in such mortgages;

provided that a lien recorded by an association for unpaid assessments shall expire six years from the date of recordation unless proceedings to enforce the lien are instituted prior to the expiration of the lien; provided further that the expiration of a recorded lien shall in no way affect the association's automatic lien that arises pursuant to this subsection or the declaration or bylaws.  Any proceedings to enforce an association's lien for any assessment shall be instituted within six years after the assessment became due; provided that if the owner of a unit subject to a lien of the association files a petition for relief under the United States Bankruptcy Code (11 U.S.C. §101 et seq.), the period of time for instituting proceedings to enforce the association's lien shall be tolled until thirty days after the automatic stay of proceedings under section 362 of the United States Bankruptcy Code (11 U.S.C. §362) is lifted.

The lien of the association may be foreclosed by action or by nonjudicial or power of sale foreclosure [procedures set forth in chapter 667], regardless of the presence or absence of power of sale language in an association's governing documents, by the managing agent or board, acting on behalf of the association and in the name of the association; provided that no association may exercise the nonjudicial or power of sale remedies provided in chapter 667 to foreclose a lien against any unit that arises solely from fines, penalties, legal fees, or late fees, and the foreclosure of any such lien shall be filed in court pursuant to part IA of chapter 667.

In any such foreclosure, the unit owner shall be required to pay a reasonable rental for the unit, if so provided in the bylaws or the law, and the plaintiff in the foreclosure shall be entitled to the appointment of a receiver to collect the rental owed by the unit owner or any tenant of the unit.  If the association is the plaintiff, it may request that its managing agent be appointed as receiver to collect the rent from the tenant.  The managing agent or board, acting on behalf of the association and in the name of the association, unless prohibited by the declaration, may bid on the unit at foreclosure sale, and acquire and hold, lease, mortgage, and convey the unit.  Action to recover a money judgment for unpaid common expenses shall be maintainable without foreclosing or waiving the lien securing the unpaid common expenses owed."

SECTION 4.  Section 667-1, Hawaii Revised Statutes, is amended by amending the definition of "power of sale" to read as follows:

""Power of sale" or "power of sale foreclosure" means a nonjudicial foreclosure when [the]:

    (1)   The mortgage contains, authorizes, permits, or provides for a power of sale, a power of sale

foreclosure, a power of sale remedy, or a nonjudicial foreclosure[-]; or

(2)  For the purposes of part VI, an association enforces its claim of an association lien, regardless of whether the association documents provide for a power of sale, a power of sale foreclosure, a power of sale remedy, or a nonjudicial foreclosure."

SECTION 5.  Sections 3 and 4 of this Act shall be applied retroactively to any case, action, proceeding, or claim arising out of a nonjudicial foreclosure under section 667-5 (repealed June 28, 2012), Hawaii Revised Statutes, and parts II and VI of chapter 667, Hawaii Revised Statutes, that arose before the effective date of this Act and in which a final non-appealable judgment has not yet been entered.

SECTION 6.  This Act shall not be applied so as to impair any contract existing as of the effective date of this Act in a manner violative of either the Hawaii State Constitution or Article I, section 10, of the United States Constitution.

SECTION 7.  If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the invalidity does not affect other provisions or applications of the Act that can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.

SECTION 8.  Statutory material to be repealed is bracketed and stricken.  New statutory material is underscored.

SECTION 9.  This Act shall take effect upon its approval; provided that the amendments made to section 514B-146(a), Hawaii Revised Statutes, by section 3 of this Act shall not be repealed when that section is reenacted on June 30, 2020, pursuant to section 6 of Act 195, Session Laws of Hawaii 2018.

(Footnote omitted.)

Act 282 became law without the Governor's signature effective July 10, 2019.  2019 Haw. Sess. Laws Act 282, §§ 1-9, at 779-83; 2019 House Journal, at 734-35 (Gov. Msg. No. 1402).

### b.    Malabes' supplemental briefing

The Malabes primarily argue that "while Act 282 writes into an association's governing documents an express power of sale, it does not (and cannot) create a mortgage containing a power of

sale for the association."  The Malabes point out that in its preface, Act 282 states "that condominium associations should be able to use nonjudicial foreclosure to collect delinquencies regardless of the presence or absence of power of sale language in an association's governing documents[,]" and that in Section 2 of Act 282 ("Section 2"), HRS § 514B-146 has been amended to state that an association's lien "may be foreclosed by action or by nonjudicial or power of sale foreclosure, regardless of the presence or absence of power of sale language in an association's governing documents."

The Malabes also argue that Section 4 of Act 282's ("Section 4") amendment to the definition of "power of sale" or "power of sale foreclosure" does not affect its wrongful foreclosure case, as it did not change the mortgage requirements of Part I of HRS Chapter 667.  Instead, according to the Malabes, by definition, Act 282 gives an association the right to conduct a nonjudicial foreclosure, either through a mortgage giving the association a power of sale, or under Parts II or VI of HRS Chapter 667 with a statutory right to conduct that power of sale.  Thus, although Act 282 states that it shall be "applied retroactively to any case, action, proceeding, or claim arising out of a nonjudicial foreclosure under section 667-5 (repealed June 28, 2012) [in Part I of HRS Chapter 667] . . . and parts II and VI of chapter 667 . . . that arose before the

effective date of this Act and in which a final non-appealable judgment has not yet been entered[,]" the Malabes argue nothing in Act 282 amends HRS § 667-5 nor alters how that statute should be construed.

The Malabes further contend that if Act 282 can be construed to permit condominium associations to foreclose based on Part I of HRS Chapter 667 and the now repealed HRS § 667-5 by statutorily conferring a "mortgage that contains a power of sale" on the association, Act 282 is unconstitutional as it violates (1) the Contracts Clause of the United States Constitution, (2) the separation of powers doctrine, (3) the Malabes' rights to due process and equal protection, and (4) the Malabes' rights under the Fifth Amendment to the United States Constitution and article 1, section 20 of the Hawai'i Constitution, which protect them from uncompensated takings. Because the United States District Court ruled Act 282 unconstitutional based only on the Contracts Clause, we include these parties' arguments in that regard.

As to the Contracts Clause violation, the Malabes point out that it is undisputed that the AOAO does not have a mortgage or an agreement containing a power of sale. If Act 282 is interpreted to create a mortgage with a power of sale between the AOAO and the Malabes, the Malabes argue Act 282 constitutes a "substantial impairment of a contractual relationship[]"

41

because "[a] mortgage is a contract that transfers interests in real property as security for the performance of a contractual obligation for payment" and "cannot be created by statute." Additionally, the Malabes assert there is no legitimate public purpose furthered by Act 282's retroactive application to Part I of HRS Chapter 667, as the only effect of such retroactive application is "to eliminate AOAO's and other associations' liability in ongoing litigation to the detriment of homeowners and for the benefit of those associations[,]" which is not a legitimate purpose, citing Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983) and Anthony v. Kualoa Ranch, 69 Haw. 112, 118-19, 736 P.2d 55, 60 (1987).

### c.    AOAO's supplemental briefing

The AOAO asserts that "the plain language of SB 551 is a 'clear legislative act' that has the practical effect of granting the AOAO 'the power to extrajudicially sell another person's property,' regardless of the presence or absence of power of sale language in the AOAO's governing documents." (Brackets omitted.)  The AOAO also maintains Act 282 applies to its appeal because it merely "clarifies" the legislature's intent and does not change existing law, citing Awakuni v. Awana, 115 Hawai'i 126, 143, 165 P.3d 1027, 1044 (2007).  The AOAO argues that Act 282 "must be applied" to this case because courts are to "apply the law in effect at the time it renders

its decision," Landgraf v. USI Film Prods., 511 U.S. 244, 264 (1994), and when so applied, this court should reverse the ICA's vacatur of Count I, the Malabes' wrongful foreclosure claim. (Emphasis added.)

With respect to the constitutionality of Act 282 based on the Contracts Clause, the AOAO maintains there is no contractual relationship between the AOAO and the Malabes as "this proceeding is created and governed entirely by statute," and therefore Act 282 does not violate the Contracts Clause. Further, the AOAO argues Act 282 "neither grants the AOAO a mortgage, nor does it insert power of sale language in the AOAO's governing documents" because the AOAO "always had the right to utilize the nonjudicial foreclosure procedures set forth in HRS Chapter 667 in a like manner as a mortgage, regardless of the presence or absence of power of sale language in its governing documents," as set forth in Act 282. According to the AOAO, "[s]uch clarification of the statutory constructs, which giving rise to [the] statutory relationship at issue, does not violate the Contract Clause."

The AOAO argues because the Malabes purchased the Apartment subject to the statutorily governed property regime of the AOAO that is subject to amendment, they cannot establish that there was a substantial impairment on any possible contractual relationship that may exist between them and the AOAO.

43

Additionally, the AOAO contends Act 282 was enacted to further the legitimate public purpose addressed in its preamble.  The AOAO quotes from the preamble to argue that the "public purpose" is to provide "associations . . . a more efficient alternative, such as power of sale foreclosure, to provide a remedy for recurring delinquencies" as it is "crucial that condominium associations be able to secure timely payment of dues to provide services to all residents of a condominium community" given that "condominiums provide a valuable housing resource in Hawaii, especially with limited space available for new development."

### d.   Analysis

With respect to the possible applicability of Act 282 to this case, we examine three parts: its preamble, the statutory amendments in Sections 3 of Act 282 ("Section 3") and 4, and provisions regarding its application or effectiveness (namely, the retroactive application provision) in Section 5 of Act 282 ("Section 5").

### i.   Retroactive application (Section 5)

Section 5 states:

> Sections 3 and 4 of this Act shall be applied retroactively to any case, action, proceeding, or claim arising out of a nonjudicial foreclosure under section 667-5 (repealed June 28, 2012), Hawaii Revised Statutes, and parts II and VI of chapter 667, Hawaii Revised Statutes, that arose before the effective date of this Act and in which a final non-appealable judgment has not yet been entered.

In other words, the legislature states that the statutory revisions in Sections 3 and 4 "shall be applied retroactively"

to cases where the nonjudicial foreclosure occurred pursuant to Parts I (i.e., HRS § 667-5), II, or VI of HRS Chapter 667.  As previously noted, the AOAO had foreclosed on the Malabes' Apartment pursuant to HRS § 667-5 in Part I of HRS Chapter 667.

### ii.  Statutory amendments (Sections 3 and 4)

HRS § 514B-146(a)(2), which creates the statutory lien for condominium associations and provides for the foreclosure of such liens, has been amended in Section 3 as follows: "The lien of the association may be foreclosed by action or by nonjudicial or power of sale foreclosure [procedures set forth in chapter 667], regardless of the presence or absence of power of sale language in an association's governing documents, by the managing agent or board, acting on behalf of the association and in the name of the association . . . ."

Section 4 modifies the definition of "power of sale" or "power of sale foreclosure" in HRS § 667-1, which provides definitions for the entire chapter, so that it reads:

> ""Power of sale" or "power of sale foreclosure" means a nonjudicial foreclosure when [the]:
>
> (1)   The mortgage contains, authorizes, permits, or provides for a power of sale, a power of sale foreclosure, a power of sale remedy, or a nonjudicial foreclosure[.]; or
>
> (2)   For the purposes of part VI, an association enforces its claim of an association lien, regardless of whether the association documents provide for a power of sale, a power of sale foreclosure, a power of sale remedy, or a nonjudicial foreclosure."

Addressing Section 3 first, the plain language of the revisions to HRS § 514B-146(a)(2) limits the means by which condominium associations may foreclose on their liens to those: (1) "by action," (2) "by nonjudicial," or (3) "power of sale foreclosure, regardless of the presence or absence of power of sale language in an association's governing documents."  When Section 3 is read together with the revisions to HRS § 667-1 in Section 4,[30] the result is the same, that there are three methods by which condominium associations may foreclose their liens: (1) by judicial action, (2) by nonjudicial foreclosure when the mortgage contains a nonjudicial foreclosure or power of sale provision, or (3) by power of sale foreclosure, regardless of the presence or absence of power of sale language in an association's governing documents.  With respect to the third method, Section 4's amendment to HRS § 667-1 specifically contemplates that such "power of sale foreclosure" be conducted under Part VI, which is distinct from Part I of HRS Chapter 667, and subject to new consumer protection provisions in Section 2.

Thus, should Act 282 apply to this case, as urged by the AOAO, the AOAO's "authority" to nonjudicially foreclose upon the Malabes under Part I of HRS Chapter 667 must fall into one of

---

[30]   Although the definitions contained in HRS § 667-1 do not expressly apply to HRS § 514B-146, these amendments should be read together, because: (1) Chapter 514B does not define "power of sale" or "power of sale foreclosure," and (2) Act 282's amendments were meant to "clarify" the condominium statutory scheme, and HRS § 514B-146 had previously referenced Chapter 667.

these three methods.  It clearly does not fall under the first, as the foreclosure was not a judicial action.  It also clearly does not fall under the third, as the foreclosure was not conducted pursuant to Part VI.  Thus, for the AOAO to have appropriately foreclosed on the Malabes' Apartment, its "authority" must have fallen under the second method, i.e., by nonjudicial foreclosure when the mortgage contains a nonjudicial foreclosure or power of sale provision.

Given that Section 5 states that the revisions in Sections 3 and 4 are to apply retroactively to cases involving nonjudicial foreclosures made under Part I of HRS Chapter 667, i.e., HRS § 667-5, we return to the relevant text of that section to examine the impact of Sections 3 and 4 and the second method of foreclosure discussed above:

> **Foreclosure under power of sale; notice; affidavit after sale.**  (a)  When a power of sale is contained in a mortgage, and where the mortgagee, the mortgagee's successor in interest, or any person authorized by the power to act in the premises, desires to foreclose under power of sale upon breach of a condition of the mortgage, the mortgagee, successor, or person shall be represented by an attorney who is licensed to practice law in the State and is physically located in the State.

HRS § 667-5.  Again, by the plain language of the statute, the statute applies "[w]hen a power of sale <u>is contained in a mortgage</u>," which is the second means of foreclosure previously discussed.  Thus, the plain language of Act 282's amendments does not change the analysis above with respect to nonjudicial foreclosures pursuant to Part I of HRS Chapter 667.  In other

words, nothing in HRS § 514B-146 nor its legislative history provide any indication that the legislature provided "a blanket grant of powers of sale to all associations over all apartments/units within those associations." Sakal, 143 Hawai'i at 228, 426 P.3d at 452. Indeed, Act 282's references to Part I of HRS Chapter 667 nonjudicial foreclosures repeatedly underscore that such foreclosures are those that occur "when a power of sale is contained in a mortgage." Thus, as the Malabes argue, Act 282 did nothing to amend Part I of HRS Chapter 667's mortgage requirement.

Arguably, Section 5 would not have stated that Act 282 "shall" apply retroactively to condominium association foreclosures made under Part I of HRS Chapter 667 if Act 282 has no practical effect on such foreclosures. However, as previously discussed, the statutory textual changes in Sections 3 and 4 are unambiguous and do not have any effect on HRS § 667-5. Nevertheless, although "[o]ur statutory construction is guided by the following well established principles[,] our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself," Lingle v. Hawai'i Gov't Employees Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005), to

the extent there may be ambiguity when Section 5 is construed

alongside Sections 3 and 4, we next examine Act 282's preamble.

### iii. The preamble

With respect to reliance on subsequent legislative history,

we recently stated in an opinion construing HRS § 667-1.5:

> [R]eliance on a subsequent legislative committee report written 153 years after enactment of the statute underscores the criticism this approach has repeatedly garnered from the United States Supreme Court. United States v. Texas, 507 U.S. 529, 535 n.4, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) ("[S]ubsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress." (quoting Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990))); United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960).

Monalim, No. SCWC-16-0000807, at 42-43.  Similar to

HRS § 667-1.5 at issue in Monalim, the predecessor statute to

the nonjudicial foreclosure process in HRS § 667-5, repealed in

2012, had been in existence for at least 135 years, since at

least 1884.  Silva v. Lopez, 5 Haw. 262, 264 (Haw. Kingdom 1884).

Subsequent legislative history is a hazardous basis for

inferring the intent of an earlier legislature after any passage

of time.  The inherent flaws in the doctrine as a method of

ascertaining legislative intent is clearly manifested by its

application to a statute enacted more than 135 years ago.

In any event, Act 282 does not affect our analysis.  The

preamble to Act 282 begins with an acknowledgement by the

legislature that condominiums provide a valuable housing

resource given limited land availability for development, that

the timely collection of association fees is necessary to provide services to all residents of a condominium community, and that delinquencies and enforcement expenses were unfairly burdening those condominium owners who did timely pay their fees.  See 2019 Haw. Sess. Laws Act 282, § 1 at 779.  The legislature then goes on to discuss the legislative intent of amendments to the condominium statutory scheme since 1998 to support its "find[ing] that condominium associations, since 1999, have been authorized to conduct nonjudicial foreclosures regardless of the presence or the absence of power of sale language in an association's governing documents."  Id.

Specifically, the legislature states that "Act 236, Session Laws of Hawaii 1999, provided a statutory grant of power and an incorporation into written documents authorizing condominium associations to utilize nonjudicial foreclosure under sections 667-5 (repealed June 28, 2012) [Part I of HRS Chapter 667] and 667-40 [Part II of HRS Chapter 667], Hawaii Revised Statutes, to enforce their liens[,]" and that such "intent was not abrogated" by subsequent amendments to the condominium statutory regime. 2019 Haw. Sess. Laws Act 282, § 1 at 779-80.  (Emphasis added.) This characterization of Act 236 differs from the analysis of the same provision in Sakal, which interpreted Act 236's amendment to HRS § 514A-90 to mean that condominium associations could avail themselves of the nonjudicial or power of sale

50

procedures contained in HRS Chapter 667, but that HRS § 514A-90 did not grant a blanket statutory grant of power to condominiums to foreclose nonjudicially.  143 Hawaiʻi at 226, 426 P.3d at 450.

Even if subsequent legislative history were to be applied,[31] however, the differences in interpretation of the effect of Act 236 in Sakal and Act 282's preamble do not affect our analysis. This is because the reason why such legislative history is included is elucidated further in the preamble:

> Since the enactment of part VI of chapter 667, Hawaii Revised Statutes, associations have conducted nonjudicial foreclosures as part of their efforts to collect delinquencies and sustain their financial operations. Associations have done so subject to the restrictions on nonjudicial foreclosures and other collection options imposed by the legislature, which include:
> (1)   Prohibiting the use of nonjudicial foreclosure to collect fines, penalties, legal fees, or late fees;
> (2)   Requiring associations to give an owner sixty days to cure a default before proceeding with the nonjudicial foreclosure and to accept reasonable payment plans of up to twelve months; and
> (3)   Requiring associations to provide owners with contact information for approved housing counselors and approved budget and credit counselors.
>      However, the intermediate court of appeals in Sakal v. Association of Apartment Owners of Hawaiian Monarch, 143 Haw. 219, 426 P.3d 443 (2018), held that the legislature intended that associations can only conduct nonjudicial foreclosures if they have specific authority to conduct nonjudicial foreclosures in their declaration or bylaws or in an agreement with the owner being foreclosed upon.

---

[31]   Contrary to the dissent's assertion, we do not use subsequent legislative history in a limited fashion and our examination of the preamble, the statutory amendments in Sections 3 and 4, and provisions regarding its application or effectiveness regarding retroactive application in Section 5 was to ascertain the actual effect of Act 282.  Subsequent legislative history remains a hazardous basis for inferring the intent of an earlier legislature, even of the 1999 legislature that passed Part II of HRS Chapter 667.  See Pension Benefit Guar. Corp., 496 U.S. 633, 650 (1990).

> The legislative history indicates this was not the intent of the legislature in 1999, nor in legislatures that have made subsequent amendments.  Therefore, this Act confirms the legislative intent that condominium associations should be able to use nonjudicial foreclosure to collect delinquencies regardless of the presence or absence of power of sale language in an association's governing documents.
> This Act also provides an additional consumer protection by requiring the foreclosing association to offer mediation with any notice of default and intention to foreclose and the procedures when mediation is chosen by the consumer.

2019 Haw. Sess. Laws Act 282, § 1 at 780 (emphases added).

Thus, the purpose of Act 282 is to directly address Sakal's holding "that the legislature intended that associations can only conduct nonjudicial foreclosures if they have specific authority to conduct nonjudicial foreclosures in their declaration or bylaws or in an agreement with the owner being foreclosed on[,]" by ensuring that condominium associations may conduct nonjudicial foreclosures under Part VI of HRS Chapter 667 regardless of the presence or absence of power of sale language in an association's governing documents.  Indeed, based on its statements in the preamble, it appears that the legislature assumes that since Part VI was enacted in 2012,[32] associations have conducted nonjudicial foreclosures "subject to the restrictions on nonjudicial foreclosures and other collection options imposed by the legislature."  The legislature states that in addition to these restrictions, Act 282 would

---

[32]    "Part VI of HRS chapter 667, which provides an alternative power of sale foreclosure procedure specifically tailored to associations, did not exist prior to 2012."  Sakal, 143 Hawai'i at 224, 426 P.3d at 448.

provide "an <u>additional</u> consumer protection" to require an offer of any mediation with any notice of default, as detailed in Section 2.

In sum, the purpose of the legislature in enacting Act 282, as set forth in the Act's preamble, is to ensure that associations may conduct nonjudicial foreclosures <u>under Part VI</u> of HRS Chapter 667 regardless of the presence or absence of power of sale language in an association's governing documents. This interpretation is also supported by the Conference Committee Report that accompanied the version of the bill that was ultimately passed.[33]

---

[33]        [Y]our Committee on Conference notes that condominium associations have relied for years on the remedy of nonjudicial foreclosure as a way of collecting delinquent maintenance fees, which are necessary for the basic operations of associations. Your Committee on Conference further finds that under the <u>Sakal</u> case, many associations have lost the benefit of the nonjudicial foreclosure process. As a result, there are concerns that an association's ability to conduct a nonjudicial foreclosure will no longer depend on legislative intent, but whether specific language in the declaration or bylaws was included when the project was first created. Your Committee on Conference notes that the extensive legislative history indicates this was not the intent of the Legislature.

        Accordingly, amendments to this measure are necessary to clarify that condominium associations should be able to use nonjudicial foreclosure to collect delinquencies regardless of the presence or absence of power of sale language in an association's governing documents.

Conf. Comm. Rep. No. 65 (Apr. 25, 2019), <u>available at</u> https://www.capitol.hawaii.gov/session2019/CommReports/SB551_CD1_CCR65_.pdf; 2019 House Journal, at 1566 (statement of Committee on Conference).

    Again, the Malabes' foreclosure was conducted pursuant to Part I of HRS Chapter 667, and the <u>Sakal</u> foreclosure was conducted pursuant to Part II of HRS Chapter 667. Thus, Act 282 affects neither.

This supports the plain language statutory interpretation of Sections 3 and 4 previously discussed.  Nothing in Act 282's preamble or accompanying legislative history indicates that the purpose of Act 282 was to ensure that condominium associations may conduct foreclosures under Part I of HRS Chapter 667 without a mortgage.  Rather, it appears that the legislature found it significant that associations' power to nonjudicially foreclose be tempered by specific statutory restrictions and requirements, including a sixty-day opportunity to cure that is not available under Part I of HRS Chapter 667, and even added protections in Section 2.  Thus, despite Act 282's inclusion of the legislature's perspective of the legislative history behind amendments permitting condominiums to nonjudicially foreclose in certain circumstances, for the foregoing reasons, that legislative history does not bear on how the statutory amendments in Sections 3 and 4 are to be construed.

Based on the foregoing analysis, Act 282 simply does not apply to this litigation.  Accordingly, based on the doctrine of constitutional avoidance, Rees, 113 Hawai'i at 456, 153 P.3d at 1141, we therefore do not address the Malabes' constitutional challenges to Act 282.

We also note, however, that although not binding on state courts, the decision of the United States District Court for the District of Hawai'i that Act 282 is unconstitutional as violative

54

of the Contracts Clause would be entitled to respectful

consideration.  State v. Gates, 576 P.2d 1357, 1359 (Ariz. 1978)

(citing State v. Norflett, 337 A.2d 609 (N.J. 1975); People v.

Bradley, 460 P.2d 129 (Cal. 1969).[34]

Despite ruling that there were no constitutional violations

based on separation of powers, due process, equal protection, or

takings without just compensation, Judge Kobayashi ruled as

follows with respect to the alleged violation of the Contracts

Clause:[35]

### []Contracts Clause

The Contracts Clause restricts the power of States to disrupt contractual arrangements.  It provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const., Art. I, § 10, cl. 1. . . .  [T]he Clause applies to any kind of contract.

At the same time, not all laws affecting pre-existing contracts violate the Clause.  To determine when such a law crosses the constitutional line, this Court has long applied a two-step test.  The threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship.  In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.  If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation.  In particular, the Court has asked whether the state law

---

[34]   As further noted in Gates:

Even with respect to federal constitutional issues, the state and lower federal courts occupy comparable positions, a sort of parallelism with each governed by the same reviewing authority the United States Supreme Court.  State v. Coleman, 46 N.J. 16, 214 A.2d 393 (1965), cert. den., 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966).

576 P.2d at 1359.

[35]   See supra note 4.

is drawn in an "appropriate" and "reasonable" way to advance "a significant and legitimate public purpose."

Sveen v. Melin, --- U.S. ---, 138 S.Ct. 1815, 1821-22, 201 L.Ed.2d 180 (2018) (some alterations in Sveen).

### 1) **First Step**

The first step has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.

This Court previously recognized that a condominium's governing documents are contractual obligations between the condominium association and a condominium owner.  A contractual relationship did exist between Plaintiffs and the AOAO.  Under that contract, Plaintiffs were obligated to pay association fees and, when they failed to do so, the AOAO had the ability to obtain a lien and seek satisfaction.  Implicit in the AOAO's contractual right to lien recovery is the obligation that the AOAO act in good faith and pursue the recovery in a legally permissible manner.

As this case currently stands, the AOAO obtained Plaintiffs' unit as a result of a nonjudicial foreclosure (a process to which the AOAO was not legally permitted to use at the time the contract was entered) and Plaintiffs sought damages resulting from this foreclosure by filing the instant action.  Act 282 became law and now retroactively validates the AOAO's nonjudicial foreclosure of Plaintiffs' unit and extinguishes Plaintiffs' ability to recover for their wrongful foreclosure claim.  Thus, the act does interfere with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.

All three parts of the first step of the analysis have therefore been met.

### 2) **Second Step**

The second step of the analysis - whether Act 282 is a reasonable way to address a significant and legitimate public purpose – requires scrutiny of the act's purpose which is to confirm the legislative intent that condominium associations should be able to use nonjudicial foreclosure to collect delinquencies regardless of the presence or absence of power of sale language in an association's governing documents.  2019 Haw. Sess. Laws Act 282, § 1 at 780.  Because Act 282 benefits a favored group and not a basic societal interest, it does not appear to be enacted for the public good.  Most telling is that Act 282 serves to revive the Part I process solely for condominium associations and without the homeowner/consumer protections enacted by legislatures in 2012 and in subsequent years. The Court therefore finds Act 282 does not address a significant and legitimate public purpose.

Act 282 therefore is unconstitutional because it violates Plaintiffs' rights under the Contracts Clause of the United States Constitution.

Galima, 2020 WL 1822599, at \*13-\*15 (case citations, some quotation marks, and brackets omitted).  Thus, Judge Kobayashi has ruled Act 282 unconstitutional based on the Contracts Clause.

In any event, as discussed above, Act 282 does not apply to the Malabes' claims based on Part I of HRS Chapter 667.  It is therefore unnecessary for us to consider the multiple constitutional challenges that the Malabes present.

**B.    Based on standards applicable to HRCP Rule 12(b)(6) motions to dismiss, the Malabes' UDAP claim should not have been dismissed**

Finally, we turn to the Malabes' certiorari application. The issue is whether the ICA correctly affirmed the circuit court's dismissal of the UDAP count in the Malabes' December 13, 2016 complaint based on the four-year statute of limitations for UDAP claims based on its ruling that equitable tolling for fraudulent concealment was inapplicable as a matter of law.

As repeatedly noted, this case comes to us from the circuit court's grant of a HRCP 12(b)(6) motion to dismiss.  In Reyes-Toledo, we reaffirmed the notice pleading standard, and noted that

> a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [their] claim that would entitle [them] to relief.  The appellate court must therefore view a plaintiff's complaint in a light most favorable to [them] in order to determine whether the allegations contained therein could warrant relief under any alternative theory.  For this reason, in reviewing a circuit court's order dismissing a complaint .

57

> . . the appellate court's consideration is strictly limited
> to the allegations of the complaint, and the appellate
> court must deem those allegations to be true.

143 Hawai'i at 257, 428 P.3d at 769 (ellipsis in original).

Thus, courts must accept the Malabes' complaint allegations as true. According to the complaint, the AOAO published a notice that it would sell the Malabes' Apartment pursuant to HRS § 667-5 and HRS Chapters 514A and/or 514B, including HRS § 514B-146, on December 17, 2010. The complaint asserts HRS § 667-5 was a nonjudicial foreclosure process that could only be used by the holder of a mortgage containing a power of sale, and that the AOAO did not hold a mortgage containing a power of sale. The complaint further asserts that HRS § 667-5 did not contain consumer protection provisions contained in Part II of Chapter 667, and that the AOAO conducted the sale under HRS § 667-5 to circumvent such protections for its own gain, in violation of fiduciary duties, executing a quitclaim deed to itself as grantor and grantee on January 4, 2011, which was recorded on January 7, 2011. The Malabes also note that Santiago holds the duty to avoid misrepresentations so strong that they, as plaintiffs, were under no duty to discover the truth. 137 Hawai'i at 153, 366 P.3d at 628. They assert the AOAO fraudulently concealed the wrong it was committing by implying, stating, and/or misrepresenting that it was authorized to use HRS § 667-5 and/or that it held a mortgage with a power

of sale when it did not.  Finally, they assert they did not

discover their claims until around July 2016.

The Malabes' complaint was filed on December 13, 2016,

almost six years after the notice of sale and the quitclaim

deed.  The Malabes assert the UDAP four-year statute of

limitations under HRS § 480-24 was equitably tolled by HRS §

657-20's extension for fraudulent concealment.[36]

---

[36]    With respect to the UDAP claim, the basis for the circuit court's
dismissal was unclear, but the ICA ruled the circuit court's dismissal of
this claim was proper based solely on the statute of limitations.  On
certiorari, the Malabes continue to assert the four-year statute of
limitations under HRS § 480-24 quoted below was tolled pursuant to
HRS § 657-20, which provides:

> §657-20  **Extension by fraudulent concealment.**  If any
> person who is liable to any of the actions mentioned in
> this part or section 663-3, fraudulently conceals the
> existence of the cause of action or the identity of any
> person who is liable for the claim from the knowledge of
> the person entitled to bring the action, the action may be
> commenced at any time within six years after the person who
> is entitled to bring the same discovers or should have
> discovered, the existence of the cause of action or the
> identity of the person who is liable for the claim,
> although the action would otherwise be barred by the period
> of limitations.

The dissent points out that in Rundgren v. Bank of New York Mellon, 777
F. Supp. 2d 1224 (D. Haw. 2011), the United States District Court for the
District of Hawaiʻi determined that HRS § 657-20, which allows for the statute
of limitations to be tolled by reason of fraudulent concealment for claims
"mentioned in [Part I of HRS Chapter 657] or section 663-3," did not apply
for UDAP claims, which arise under HRS Chapter 480.  777 F. Supp. 2d at 1228-
29.
    With respect to the applicability of HRS § 657-20 to a HRS Chapter 480
UDAP claim, HRS § 657-10 (1985) provides that "[t]his part shall not extend
to any action which is, or shall be, limited by any statute to be brought
within a shorter time than is herein prescribed; but the action shall be
brought within the time limited by the statute."
    Based on the language of HRS § 480-24, see supra note 12, it appears
HRS § 657-20 would not apply to a HRS Chapter 480 claim.
    This court has yet to determine, however, when a cause of action
"accrues" for purposes of the UDAP statute.  This court has also yet to
determine whether the Santiago holding, that the duty to avoid
misrepresentations is so strong that plaintiffs are under no duty to discover
                                                      (continued. . .)

(. . .continued)
the truth, 137 Hawai'i at 153, 366 P.3d at 645, would also apply to equitable tolling of a UDAP claim.

In this regard, as the dissent also points out, Rundgren recognized "equitable tolling" by reason of fraudulent concealment of the statute of limitations governing a HRS § 480-2 claim. The dissent maintains, however, that based on Au v. Au, 63 Haw. 210, 626 P.2d 173 (1981), equitable tolling could not apply to the Malabes' UDAP claim:

> The fraudulent concealment which will postpone the operation of the statute must be the concealment of the fact that plaintiff has a cause of action. If there is a known cause of action there can be no fraudulent concealment. . . .
> It is not necessary that a party should know the details of the evidence by which to establish his cause of action. It is enough that he knows that a cause of action exists in his favor, and when he has this knowledge, it is his own fault if he does not avail himself of those means which the law provides for prosecuting or preserving his claim.

63 Haw. at 215–16, 626 P.2d at 178 (ellipsis in original). The Malabes' complaint pled that the AOAO had fraudulently concealed the wrongfulness of the foreclosure proceedings by implying, stating, and/or misrepresenting that it held a mortgage with a power of sale when it did not, or that it was authorized to use HRS § 667-5 when it could not, that they relied on the false statements and representations of the AOAO concerning the AOAO's right to conduct a public sale pursuant to HRS § 667-5, and that they were entitled to so rely because they were members of the AOAO, because of the AOAO's trustee-like relationship with them, and because the AOAO was acting as an agent or attorney on their behalf. Based on our notice pleading standards, we therefore cannot say that "it appears beyond doubt that the [Malabes] can prove no set of facts in support of [their] claim that would entitle [them] to relief" with respect to equitable tolling by reason of fraudulent concealment based on the Au standard.

We also strongly disagree with the dissent's imposition of federal court pleading standards for fraudulent concealment onto our state courts. Rundgren explicitly states:

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); see also Weber v. Dep't of Veterans Affairs, 521 F.3d 1061, 1065 (9th Cir. 2008). This tenet—that the court must accept as true all of the allegations contained in the complaint—"is inapplicable to legal conclusions." Iqbal, 129 S.Ct. at 1949. Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555, 127 S.Ct. 1955). Rather, "[a] claim has facial plausibility when the plaintiff pleads

(continued. . .)

60

The Malabes' assertion that the AOAO "fraudulently concealed the wrong [it was] committing by implying, stating and/or misrepresenting that . . . [it] held a mortgage with a power of sale when in fact [it] did not[,]" must be taken as true.

In ruling on the AOAO's HRCP Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a court must view the complaint in the light most favorable to the Malabes.  Based on the applicable notice

---

(. . .continued)
> factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955).  Factual allegations that only permit the court to infer "the mere possibility of misconduct" do not show that the pleader is entitled to relief.  Id. at 1950.

777 F. Supp. 2d at 1227.  The pleading standard for "fraudulent concealment" cited in Rundgren and applied by the dissent is consistent with such "plausibility" standards:

> To avoid the bar of limitation by invoking the concept of fraudulent concealment, the plaintiff must allege facts showing affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief.  Silence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure.

777 F. Supp. 2d at 1230 (quoting Rutledge v. Boston Woven Hose & Rubber Co., 576 F.2d 248, 250 (9th Cir. 1978)).

In Reyes-Toledo, we expressly rejected the Twombly/Iqbal "plausibility" pleading standards, and reaffirmed that our courts are governed by "notice" pleading standards.  143 Hawai'i at 252, 428 P.3d at 764.  We have never adopted the "plausibility" pleading standard for fraudulent concealment stated above.  Thus, the Malabes have satisfied our notice pleading standards, and the Malabes' allegations are not insufficient as a matter of law, as maintained by the dissent.

pleading standard, viewing the complaint in the light most favorable to the Malabes, it cannot be said "[they] can prove no set of facts in support of [their] claim that would entitle [them] to relief."[37]

## V. Conclusion

For the reasons stated above, we affirm the ICA's January 31, 2019 judgment on appeal to the extent it vacated the circuit court's final judgment with respect to its dismissal of Count I of the complaint, we vacate the ICA's judgment on appeal to the extent it affirmed the circuit court's February 17, 2017 final judgment as to its dismissal of Count II of the complaint, we vacate the circuit court's February 17, 2017 final judgment as to its dismissal of Count II of the complaint, and we remand this matter to the circuit court for further proceedings consistent with this opinion.

David R. Major and
Jai W. Keep-Barnes,
for petitioner

Steven K.S. Chung,
Michael L. Iosua, and
Timothy E. Ho
for respondents

M. Anne Anderson,
Paul A. Ireland Koftinow, and
John A. Morris,
for amicus curiae

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

---

[37] See supra note 36.